Kirkpatrick C. J.
At the courts of Oyer and Terminer and General Gaol Delivery in the county of Monmouth, of the sessions of May 1818, the defendant was put upon his trial on an indictment for murder, and found guilty; but -the judgment was respited for the opinion of the justices of the Supreme Court, at bar, on sundry questions raised at the trial.
The case'was reported this term by Mr. Justice Southard, who presided at the trial, and is in substance as follows: viz.
That the prisoner is a black boy who was horn in New-Jersey, in the month of August 1806, and according to the' act of February 15, 1804, entitled “ An act for the gradual *267 abolition of slavery,” is to remain the servant of the owner of his mother (she being a slave) and the executors, ad- - ministrators, and assigns of such owner, in the same manner as if he had been bound to service by the trustees or overseers of the poor, until the age of twenty-five years; that at the time when the said murder is charged to have been committed, he was of the age of ten years and ten months, or thereabouts, and was the servant of one Levi Solomon, either as the owner of his mother, or the assignee of such owner.
*That the prisoner had been arraigned and called for trial at a preceding session of the courts of Oyer and Terminer and General Gaol Delivery in the same county, in October 1817 ; that a jury had been impaneled and called, and sundry of them sworn, but by reason of defaults and challenges, the whole number of twelve did not appear; that the State then prayed a tales de circumstantibus, which the court declined to award, and thereupon the prisoner was recommitted to prison till the next sessions of the said courts, being this session of May 1818.
That the prisoner was then again brought up and put upon his trial, when again, by reason of challenges, there was a defect of jurors; that upon a tales having been prayed by the State, and awarded by the court, the prisoner had not inspection of the panel with the tales annexed, for two entire days, in order to prepare for his challenges, but he was put upon his trial instanter, without such inspection.
That in support of the prosecution, it was offered to give in evidence the confession of the prisoner, made to the inquest upon the body of the deceased, or to some of them (as will be hereafter stated) and also his confession to sundry persons afterwards, while in prison, to which evidence it was objected for the prisoner, but the objection was overruled, and the confessions admitted.
That the prisoner, in his defence, offered the said Levi Solomon, his master, as a witness in his behalf, to the admission of whom it was objected by the State, on account of his interest, and that the objection was sustained and the witness rejected.
*268 Upon this state of facts, five questions are raised for -the opinion of the justices here, by way of advisement.
1. Can the refusing the tales at the first court and the discharging the jury, after sundry of them had been sworn, have any effect in this case? and if any, what effect ?
2. Had the prisoner a right to the inspection of the panel, with the tales annexed, for two entire days, in order to prepare for his challenges before the jury should be taken against him ? and if so, what effect will the denial of that right have upon the verdict?
3. Were the confessions of the prisoner made in the • circumstances stated (and hereinafter more particularly detailed) lawful evidence against him ?
*4. Was Levi Solomon a competent witness for the prisoner ?
5. Can a court of General Gaol Delivery pronounce judgment on a conviction had at a previous court ?
1 and 5. As to the first and fifth of these questions, there can be no doubt.
The prisoner having pleaded to his indictment, and put himself upon the country for his deliverance, had a right" to his trial; and for this purpose, in the case that happened, the court is not only authorized, but also required to award tales until the whole number of twelve jurors be sworn. But though the prisoner have such right, and though the court be thus required, yet that right and this requisition, like all other things, must yield to circumstances, which frequently will bend neither to the rights of suitors nor to the power of courts, and of which the court must always be the judge. However hard it may have been, therefore, for the prisoner to be recommitted till another court, yet it was a hardship which was inevitable, and which can in no way be set up in his defence, or to exempt him from a full and fair trial.
And as to the succeeding court pronouncing judgment upon a conviction had before a former one, it is only necessary to remember that it is a court of General Gaol Delivery which always takes the prisoner as it finds him, executes the law upon him, and delivers the gaol. If *269 committed for crime, it gives him in charge to the grand jury ; if indicted, it arraigns him and takes his plea ; if he have pleaded, it tries him; and if he have been tried and convicted, it pronounces judgment upon him. In whatever stage the prosecution may be, it takes it up and proceeds to the end of the law, that the gaol may be delivered. And of this course, our books are full of precedents.
2. As to the inspection of the panel after the tales returned.
By the common law, every person indicted for murder was admitted to challenge peremptorily, and without cause, thirty-five of the jurors impanelled for his trial. These challenges were pretty early reduced by statute, in England, to the number of twenty, and our act of March 6, 1795 follows the English statute on that subject, and says, that any person who shall be indicted for murder shall be admitted peremptorily to challenge twenty of the jury and no more.
But besides these peremptory challenges, thus restrained by the statute, there may be challenges for cause without restraint. *These challenges for cause must be made out by proof to the satisfaction of triors, sworn for that purpose; and though the proof may in some cases bo by the oath of the juror himself, who is challenged, yet it cannot be so in all cases ; so that it may frequently happen, nay, I may say it must generally happen, that witnesses are to be sought for at a distance, and records of other courts to be examined, and exemplifications to be procured, in order to prove to the triors the truth of the fact, upon which the challenge is founded.
By the act relative to the Supreme and Circuit Courts, it is further provided, that if by reason of challenges, or the default of jurors, or otherwise, a sufficient number of the jurors on the original panel cannot be had to try the issue or cause, then the courts of Oyer and Terminer and General Gaol Delivery are authorized and required to award a tales de circumstantibus of persons present at the said court, and qualified according to law to be joined to the other jurors till the number of twelve be sworn; *270 WHICH TALESMEN SHALL BE LIABLE TO THE SAME CHAL- ' LENGES AS THE PRINCIPAL JURORS.
These challenges are humane provisions in favour of life; and in order to give the accused all the benefit of them, the same act of March 6, 1795, provides that any person who shall be accused and indicted for murder, shall have a copy of the indictment and a list of the jury, mentioning the names and places of abode .of such jurors, delivered, to him two entire days at least before the trial.
It appears then, that the legislature has given to the person indicted of murder, the right of challenging twenty of the jury impanelled against him, peremptorily and without cause, and also the further right of challenging any other number without restraint, by the polls, and/or cause shewn ; that to enable him to make these challenges with understanding, and to verify them by evidence, he shall have a copy of the panel two entire days before the trial; that when a sufficient number of the panel, thus to be delivered to him, shall not appear, a tales shall be awarded, but then such talesmen shall be liable to the same challenges as the principal jurors. It is true that the legislature has not said, in express words, that a copy of the panel with the talesmen annexed, (where'such tales is awarded) shall be given to the prisoner ; but still, if it be the policy of the law to give the accused *the liberty of challenging, to give him the inspection of his panel for the very purpose of enabling him'to make ■ such challenges ; and if it has provided that the talesmen, who are not upon such panel, but taken at the bar, shall be liable to the same challenges as those on the principal panel, is not the conclusion irresistible that he should have the same time to prepare for such challenges ? To what purpose give him challenges upon talesmen at all? Can he take them instanter ? Could this child take them? Could his counsel, who lived at a distance and in different Counties, take them ? And if taken, was it possible to verify them ? to verify them at the moment by the testimony of witnesses to be collected probably from distant places ?
The counsel who have spoken to this question, have admitted that no case can be found, either here upon our acts of assembly, or in England where their statutes, from *271 which ours were taken, decided directly upon this point; nor have I, in my limited library, been able to find any thing which could lead to a conclusion different from that which, I think, obviously presents itself upon the very statement of our legislative provisions on this subject.
3. With respect to the liability of infants to punishment, and to the giving of their confessions in evidence against them, much might be said, and ought to be said with great caution. I shall restrain myself to a very few observations.
It is perfectly settled, that an infant within the age of seven years cannot be punished for any capital offence, whatever circumstances of mischievous intention maybe proved against him, for by the presumption of the law, he cannot have discretion to discern between good and evil, and against this presumption no averment can be admitted. It is perfectly settled also that between the age of seven and the age of fourteen years, the infant shall be presumed to be incapable of committing crime upon the same principle, the presumption being vety strong at seven, and decreasing with the progress of his years; but then this presumption, in this case, may be encountered by proof; and if it shall appear by strong and irresistible evidence that he had sufficient discernment to distinguish good from evil, to comprehend the nature and consequences of his.,acts; he may be convicted and have judgment of death. But then, in cases of this kind, sir Matthew Hale tells us, the evidence ought to be strong and pregnant to *make it appear ho understood what he did, and especially if the accused be under the age of twelve years.
With respect to confessions in general, and especially with respect to the confessions of infants, it is necessary to be exceedingly guarded.
Sir W. Blackstone tolls us that hasty and unguarded confessions made to persons having no authority (such as wicket-liole witnesses) even in cases of felony at the common law, are the weakest and most suspicious of all testimony, ever liable to be obtained by artifice, false hopes, promises of favour, or menaces, seldom remembered accurately or reported with due precision, and *272 incapable in their nature of being disproved by negative “ evidence.
In Leach’s edition of Hawkins, we find it said that “ the human mind under the pressure of calamity, is easily seduced ; and is liable in the alarm of danger, to acknowledge indiscriminately, a falsehood or a truth, as different agitations may prevail. A confession, therefore, whether made upon an official examination, or in discourse with private persons, which is obtained from a defendant either by the flattery of hope or by the impressions of fear, however slightly the emotion may be implanted, is not admissible evidence ; for the law will not suffer a prisoner to be made the deluded instrument of his own conviction. But if any facts arise in consequence even of such a confession, they may be given in evidence, because they must ever be immutably the same, whether the confession which disclosed them be true or false, and justice cannot suffer by the admission. The truth of these contingent facts, however, must be proved independently of, a,nd not coupled with, or explained by the conversation or confession from which they are derived.”
If this be so with respect to confessions in general, how much more strongly does it apply to the confessions of infants, especially under the age of twelve years ?
Sir M. Hale, speaking of the trial of infants of such tender years, says, the evidence ought to be strong and pregnant; that is, as I understand it, disclosing or bringing forth facts or circumstances, which, independently of the confession itself, are sufficient to establish the guilt; for he afterwards expressly says, that the infant is not to be convict upon his own confession, but *the jury must inquire of the circumstances disclosed by it, and upon them alone a conviction can be had.
The law then, I think, seems to be pretty well settled, that upon the naked confession of such an infant, he cannot be convicted of a capital offence.
In the case before us, from the statement of Mr. Justice Southard, it appears, that this boy, when first interrogated by the inquest, denied the fact; that he was then taken apart by one or more of the jurors, and told that he had better confess the whole truth, and that he did then confess *273 that he liad thrown the child into the well, in which the body had been found, and from which he had seen taken; that upon this confession he was committed to prison, and while in prison, declared the same thing in the hearing of the gaoler, and of sundry other persons, for some time; but that afterwards, till the time of the trial he uniformly denied it.
It is difficult to say how far this boy’s mind.might have been impressed with hope or fear by the language of the jurors who first interrogated him ; it is certain however, that the confession was not altogether spontaneous, for at first he stoutly denied the fact; but having once confessed it is not strange, but rather according to ordinary course of things, that he should, while in prison and under the same impressions, repeat the same story. If the confession, however, rested upon the ground of hope and fear alone, doubtful as it might be, I should have been inclined to yield to its competency, and to leave it to the discretion and judgment of the jury.
But then, as I understand this confession, it is a simple, naked confession, disclosing no fact, pregnant ivith, no circumstances to give it authority, or in any way to corroborate it. It did not even lead to the discovery of the body of the deceased, for it was found before; it opens up no proof of malice, or hatred, or ill will against the child, but rather the contrary; it is the mere naked confession of an infant under the age of eleven years, obtained by some degree of pressure, at least, after a firm denial, and as such (I speak with great deference to the learning of the court which tried the cause) I should incline to think it ought not to have been admitted as evidence ; and if admitted, that it ought not to have been the ground of a conviction.
4. As to the competency of Levi Solomon, as a witness, little *need be said. It is merely the case of master and servant, and is no way varied by the circumstance of the boy’s being black and the master white; he is, by the words of the act, put in the situation of an indented servant. And although this relation has existed from the earliest ages, no case has been produced, and I am bold to affirm, no case can bo produced, where that relation alone has been adjudged to create such an interest as to *274 exclude .the master from being a witness for the servant. Tf such a principle were once admitted, it would extend itself to all the relations in life. It would exclude the father from being a witness for his son, for he is entitled to his services ; and the son from being a witness for the father, for he is entitled to receive from him his maintenance. It would even exclude the creditor in the case of his debtor, and the debtor in the case of his creditor ; for it is easy to see that they may be mutually dependent upon the personal exertions of one another for their rights, and for their support. But these interests, however they may weigh upon the human mind, have never been considered as direct and positive, going to the competency of witnesses, but rather as collateral and femóte, going to the credibility only. I forbear to cite authorities, for no man has ever been in a court of justice, who has not seen these relations bearing testimony for and against one another.
Upon the whole then, I incline to the opinion. 1. That the prispner was entitled to the inspection of his panel with the tales annexed, for two entire days before the trial. 2. That the confession cf the prisoner, such as it is, and under- the circumstances in which it was obtained, was not lawful evidence against him, and if lawful, it was not, ground of conviction. 3. That Levi Solomon, the master, was a lawful and competent witness for the prisoner, his interest in his services, to the contrary notwithstanding. And, finally, that if I have conceived the law rightly upon these questions, or any one of them, the prisoner ought not to have judgment of death upon this conviction, but a new trial.
Rossell J.
The following questions have been submitted to the consideration of the Supreme Court by Justice Southard, arising on the trial of a negro boy at a court of Oyer and Terminer held in the county of Monmouth. May 1818, in which he presided.
1. In a criminal case, in which a prisoner is entitled to a list *of the jury, two entire days, and to his peremptory challenges, can the court of Oyer and Terminer, on the *275 awarding a tales de circumstantibus, proceed to the trial instojúer f
2. Is the master of a negro, born in this state since the year 1804, a competent witness for such servant in a capital case ?
3. Can an infant, under eleven years of age, be convicted on Ins own confession ?
1. As to the first question. The doubt has arisen on the construction of our acts of the legislature. One passed the 6th of March 1795, enacts that persons indicted for murder, &c. shall have a copy of the indictment and a list of the jury, two entire days at least, before the trial; and that every person so indicted, and voluntarily pleading not guilty, may peremptorily challenge twenty of the jury. The other passed the 6th of July 1799; the fifteenth section of which, empowers the courts of Oyer and Terminer to award a tales, &c.
If both these acts can be strictly carried into effect, there can be no contradiction. And it is certainly possible to adjourn the trial for two days, in cases where tales is awarded and the offence to be tried comes under the description of those where peremptory challenges are allowed, and it appears to me to be safest so to do, in all capital cases especially, if the person should insist on this right. For although real difficulty and much inconvenience might arise if we suppose eleven of the jurors to have been sworn before the challenges, with and without cause, are exhausted in the original panel, which would make one talesman only necessary; yet as the prisoner can now only challenge for cause shewn, to do which, he might, possibly require time and absent witnesses, it would be cruel and unjust to deprive him of a privilege on which life itself might by possibility depend. Yet as this is a personal right, established for the benefit of the accused, he may himself waive it if he thinks proper; and in a case of an infant under fourteen, this may well be done by his counsel.
2. Has the master such interest as will exclude his testimony ? I think he has not. I cannot well distinguish betwroen the interest of Levi Solomon, in this case, and that of any master of an indented servant or apprentice, or *276 that of a father and son, debtor and creditor, in special - cases, and indeed in many other relations in society. And I have never seen or heard of *any of these being excluded from giving testimony in a criminal case. The objection always goes to their credit. In Leach’s Orown Law 290, note a. After the riots in 1780, a reward was offered for the apprehension and conviction of the rioters; and a question arose, whether persons interested in the conviction were admissible witnesses. It was submitted to the twelve judges and they unanimously agreed that the testimony of witnesses entitled to the reward, was admissible notwithstanding their interest. And they mentioned witnesses entitled to rewards from the bank, post-offices, &c. &G-. Yet these had never been considered such an interest as would destroy the competency of witnesses. In page 135, a woman was offered as a witness in a capital case, whose husband had been ■ tried and convicted for the same offence. She was asked, if she believed the conviction of the accused would tend to the pardon of her husband ? She answered, she hoped and believed it would. Yet the court decided that this went to her credit, and not to her competency. In this case then, I am satisfied that Levi Solomon ought to have been permitted to give his testimony.
3. It is an established rule, that no person indicted for a capital offence, shall be convicted on his own confession without a single circumstance to corroborate it. Leach C. L. 320. This rule is general, and appears to me to extend, with some limitations, to infants under twelve, and above seven years of age. The test of their accountability is understanding, not years. Infants of nine years of age have more than once been executed for crimes, as they shewed themselves by their actions to be sensible of the offences they had committed, and of devising plans for the concealment of them. And this appears to be the only criterion by which courts and juries are to be guided in all cases of this nature. But if the culprit is under twelve, it must appear by strong and pregnant evidence, and' circumstances, that he had discretion to judge between good and evil; and not only so, if convicted in part on *277 his own confession, that confession must also be supported by strong circumstantial evidence of his guilt.
Two other minor points appeared to be incidentally raised, hut as they were not urged and seemed not much to be relied on, I should not have noticed them had not the opinion of the Chief Justice referred to them. I am of opinion with him on both.
*At the subsequent Oyer and Terminer no argument upon the rule was had, but the Court delivered the following opinion.
Southard J.
The opinion entertained by this court upon other questions, raised by the rule, will not make it necessary to investigate the power of a court of Oyer and Terminer, to pass judgment upon a conviction had at a former term. It is sufficient to remark, that we feel no doubt on the question. We think that the language of the books, but especially the character and constitution of the court, as established by statute, gives this power, and authorizes and requires its exercise.
2. Has the court of Oyer and Terminer a right to award a tales t and must the defendant have a list of thepiames, two entire days before his trial, so as to prepare his challenges to them in the same way, as to the original list1? Doubt has been felt by a part of the court upon this question, but it has yielded to the decided reasoning and advice of the Supreme Court: and we now think that in all criminal cases, a tales may be awarded where the original panel is exhausted, by challenges or otherwise.—But if a tales be awarded, and it be a case where the defendant is by the statute, entitled to the list for two days; he must have a list of the talesmen for that length of time, unless his right be explicitly waived. But although this is our opinion on this point, we should feel some hesitation in granting a new trial for this cause alone, after what occurred. The question was fully brought to the view of the defendant, through his counsel: the propriety of awarding the tales, was discussed : it was awarded and the talesmen, called, in their presence: no request for time was then made; but by proceeding immediately to *278 the trial, without objection on their part, or order by the court, they may be considered as having been ready to make their challenges, and as waiving the privilege, as far as they could do it.
3. Was there a mistrial, or is any difficulty created by the refusal to award a tales, and postponing the trial at the October sessions ? We think not. The court may, and generally ought to award a tales, where it is demanded by either party. Yet it is matter of sound discretion, and circumstances may justify its refusal. At October term, these circumstances were supposed to exist, and we now perceive no reason to doubt, that a proper *discretion was then exercised. The decision then made, can have no operation in rendering the subsequent proceedings illegal.
5. Were the confessions of the prisoner legally admitted? This is an important question, not merely to the prisoner alone, but to the correct administration of the law. The court felt, and endeavoured properly to estimate it as such, and are not now dissatisfied with the opinion expressed. It yields a ready assent to the doctrines of the law contained in the learned opinions, by the justices of the Supreme Court, although there is, in some slight degree, a difference, in the view which they take of the facts.
It is important here to remark, that we do not understand that there was, at the trial, proof of promises or threats to induce the confession, but a decided denial of both. Although the prisoner was closely pressed as a witness, and there was an anxious desire to discover all the facts, and to learn whether he had not been guilty of committing the act, which he declared .that he had seen; yet it was the anxiety only of a moral and religious community, seeking to discover the perpetrator, that it might be purged from the guilt of shedding blood: and he was repeatedly warned not to vary from the truth, and that it would be his safety. This then, as a legal question merely, is freed from difficulty arising from that source. Were the prisoner an adult, his confessions, under the circumstances, would be competent. Will the *279 fací, that lac was under the age of twelve years, render them incompetent?
The distinctions, which have been taken in the books, as to the age, when crimes may be committed and the criminal punished, are in no inconsiderable degree arbitrary. The great subject of inquiry in all cases, ought to be, the legal capacity of the prisoner ; and this is found in some, much earlier than others. The real value of the distinctions, is, to fix the party, upon whom the proof of this capacity lies. There is indeed an age so tender, that the nature and consequences of acts cannot be comprehended, and every uncorrupted feeling of the heart, as well as every, moral and legal principle, forbids punishment. But after we pass this age and progress towards maturity, there have been periods settled, which ascertain the presumption of law, as to the existence of this capacity. If under fourteen, especially under twelve years, the law presumes that it does not *exist, and if the state seek to punish, it must conclusively establish it. If above the age of fourteen, the law presumes its existence, and if the accused would seek to avoid punishment, he must overcome that presumption by sufficient evidence. But wherever the capacity is established, either by this presumption of law or the testimony of witnesses, punishment always follows the infraction of the law. If the intelligence to apprehend the consequences of acts; to reason upon duty; to distinguish between right and wrong; if the consciousness of guilt and innocence be clearly manifested, then this capacity is shewn: in the language of the books, the accused is capax doli, and as a rational and moral agent, must abide the results of his own conduct.'
This capacity to commit a crime, it appears to the court, necessarily supposes the capacity to confess it. lie who is a rational and moral agent and can merit the infliction of legal sanctions, must be able to detail his motives and acts; and must be judged by them. If therefore the defendant was of an age to be punished, he was of an age to confess his guilt. It does not seem necessary here, to investigate the cases in the books, where persons of very tender years have been punished. It is sufficient *280 to remark, that juries under the direction of judges, whose distinguishing attribute was the love of mercy, have convicted those much younger than the prisoner before us, and they have made the last solemn atonement to violated law. But they were cases where the jury were satisfied that the legal capacity existed. And so ought the jury and the court here to be satisfied, and satisfied beyond the possibility of question. If the slightest cloud of doubt rested upon the mind on this subject, it should ensure acquittal; it ought to prove the pillar which should conduct the prisoner through all his dangers to the place of safety and security.
The confessions of any one, especially of one so very young, and in an offence so highly penal, ought to be received with the strictest caution, and investigated with a desire to obviate their force. And although not induced by the impression of -threats, or the delusions of hope falsely encouraged, yet if from any circumstances the jury believe that they were incorrectly made, they should be disregarded; but being legally admissible, it is for the jury to ascertain their weight and deduce the necessary conclusions, and it is for the court clearly to explain the legal import of the evidence. This court feels no consciousness of neglect on *this point. As far as it had ability to perform the task, it left no matter of evidence and no inference of law unexplained.
It was pressed upon the jury, and we have no doubt that they remember “ that a mere naked confession ought seldom to take away life;” in the case of so young an infant, never. It ought to be accompanied by evidence of facts which could not fail to evince its truth. And this is believed to be the doctrine contained in Hale 27, which was so strongly pressed by the prisoner’s counsel.
In reviewing the propriety of admitting the confessions in this case, it will be recollected that evidence had been submitted to the jury, which was intended to prove both his capacity and the fact charged against him. I allude to the evidence of his playing with the deceased; his working in the field were the crime was committed ; his manner when told that the child was lost-; and also when he was found; his subsequent conduct in the evening *281 and morning ; and the estimate of many of the witnesses of his capacity. This evidence laid such a for his confessions, that the court did not feel authorized ’ to withhold them from the jury. .Whether under the instructions of the court, they gave them their proper weight, is not here in dispute.
6. Was Levi Solomon a competent witness? By the law of this state, Pat. 103, blacks born after 4th July 1804, are placed in all respects in the situation of persons hound to service by the overseers of the poor. Levi Solomon was not then the absolute owner of Aaron. Aaron was not the absolute slave of Lem Solomon. They stood in the relation of master and apprentice. And without furrher remark as to the consequences of a conviction to the master, there is no doubt that he was a competent witness in this case. Iiis exclusion furnishes proper ground for a new trial. In this opinion the court unanimously concur.
New trial granted.