STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. EUGENE MONAHAN, DEFENDANT, AND MICHAEL MONAHAN, DEFENDANT-APPELLANT.

Argued December 21, 1953—Decided March 22, 1954.

Mr. *Ira D. Dorian* argued the cause. for the appellant (*Mr. Thomas F. Hueston*, attorney).

Mr. *H. Russell Morss, Jr.*, County Prosecutor of Union County, argued the cause for the respondent.

The opinion of the court was delivered by

JACOBS, J. Prompted by mid-Twentieth Century sociological precepts, our Legislature has directed that children under 16 who commit any offenses which would ·be criminal if committed by adults, shall not be triable in criminal proceedings but shall be dealt with exclusively by our specialized juvenile courts. The legal issue presented to us is whether this clear statutory mandate may be judicially · disregarded to enable a first degree murder trial in the County Court of a 15-year-old boy who participated in a robbery with his father during which his father killed two persons.

In April, 1953 Eugene Monahan and his 15-year-old son Michael were indicted for the murder of William Diskin and Sebastian Weilandics. Eugene Monahan has been tried, convicted and sentenced to death and his appeal is pending before this court. The State concedes that the victims were killed by the father and not the son but asserts ·that since the homicides occurred during a robbery in which the son participated, the son was equally triable for· murder in the first degree, punishable by death unless there is a recommendation of life imprisonment. See *N. J. S.* 2*A*:113-1; *N. J. S.* 2*A*:113-2. A motion was made for transfer of the proceeding against the son to the Juvenile and Domestic Relations Court on the ground that under *N. J. S.* 2*A*:85-4 and *N. J. S.* 2*A*:4-14 it was cognizable exclusively in that court. The motion was denied and an ˙appeal was taken.

*Cf. R. R.* 1:10-1(*b*); *R. R.* 2:2-3(*a*)(*3*); *R. R.* 2:2-4; *R. R.* 2:12; *R. R.* 3:5-5(*b*)(6)(*a*). Although several preliminary procedural matters have been raised by the State, we shall pass them and proceed with the determination of the meritorious issue presented. It is of public concern, it has been fully briefed and argued, and its expeditious determination is required in the interests of complete justice. See *State v. Tune,* 13 *N. J.* 203, 209 (1953); *City of Newark v. Pulverman,* 12 *N. J.* 105, 108 (1953); *Hendrikson v. Koppers Co., Inc.,* 11 *N. J.* 600, 605 (1953).

The principle of removing or mitigating the criminal responsibility of children has ancient origins. In the early case of *State v. Aaron,* 4 *N. J. L.* 231, 244 [*Reprint* 269, 277] (*Sup. Ct.* 1818), Chief Justice Kirkpatrick restated the settled common law doctrine, adapted from earlier Roman law, that since a child under seven "cannot have discretion to discern between good and evil" he is incapable of committing crime; between the ages of seven and 14 he is subject to a rebuttable presumption of incapacity; and after 14 he is presumptively capable. See *Clark & Marshall, A Treatise on the Law of Crimes* (*5th ed.* 1952), *pp.* 125-128. Although the common law rule precluded criminal convictions of many young offenders, there are instances in which it failed to do so, with shocking consequences. Blackstone cites cases in which children of very tender age were drastically condemned as adult criminals; he refers to the hanging of an eight-year old for maliciously burning some barns; to the hanging of a ten-year-old who had killed one of his companions; and to the burning of a girl of 13 who had killed her mistress. 4 *Bl. Comm.* (*13th ed.* 1800), 23. Similar illustrations in our own State are not lacking. In 1818 a boy of 11 was tried for murder (*State v. Aaron, supra*), and in 1828 a boy of 13 was hanged for an offense which he committed when he was 12. *State v. Guild,* 10 *N. J. L.* 163 (*Sup. Ct.* 1828). During most of the Nineteenth Century, child and adult offenders were treated alike although intermittent steps were taken towards their separate confinement. It was not until the turn of the century that modern con-

cepts really began to take form; they embodied the upward movement in the child's age of criminal responsibility, the extended recognition of society's obligation as *parens patriae* to care for delinquent children, and the creation of independent juvenile courts. See *Elliott, Conflicting Penal Theories in Statutory Criminal Law* 32 (1931); *Sussman, Juvenile Delinquency* 12 (1950); *Young, Social Treatment in Probation and Delinquency* (*2d ed.* 1952), 48.

The first juvenile court in this country was established in Cook County, Illinois, by an 1899 act which provided that the child offender was to be considered a ward of the state under control of the juvenile court; proceedings were there to be conducted informally with rehabilitative supervision rather than retributive punishment in mind, and without public indictment, trial by jury and other incidents of criminal causes. Thereafter the other states adopted legislation which was comparable though specific provisions varied. Attacks on the legislation based on the absence of indictment, trial by jury and the other constitutional guarantees applicable to criminal proceedings were quickly rejected. See *Commonwealth v. Fisher,* 213 *Pa.* 48, 62 *A.* 198 (*Sup. Ct.* 1905); *Lindsay v. Lindsay,* 257 *Ill.* 328, 100 *N. E.* 892, 908 *A., N. S.,* 45 *L. R.* (*Sup. Ct.* 1913); *People v. Lewis,* 260 *N. Y.* 171, 183 *N. E.* 353, 86 *A. L. R.* 1001 (*Ct. App.* 1932), *certiorari denied,* 289 *U. S.* 709, 53 *S. Ct.* 786, 77 *L. Ed.* 1464 (1933); *Petition of Morin,* 95 *N. H.* 518, 68 *A. 2d* 668 (*Sup. Ct.* 1949). *Cf. Mack, The Juvenile Court,* 23 *Harv. L. Rev.* 104, 109 (1909). In the *Fisher* case [213 *Pa.* 48, 62 *A.* 200] the Supreme Court of Pennsylvania pointed out that the juvenile court proceeding is not "the trial of a child charged with a crime, but is mercifully to save it from such an ordeal, with the prison or penitentiary in its wake, if the child's own good and the best interests of the state justify such salvation." In the *Lindsay* case [257 *Ill.* 328, 100 *N. E.* 894] the Supreme Court of Illinois noted that the "prerogative of the state, arising out of its power and duty, as *parens patriae,* to protect the interest of infants, has always been exercised by courts of chancery" and has not

been questioned for generations. In the *Lewis* case [269 N. Y. 171, 183 N. E. 354] the New York Court of Appeals stated that there is no doubt about the power of the legislature "to say that an act done by a child shall not be a crime." And in the recent *Morin* case [95 N. H. 518, 68 A. 2d 670] the Supreme Court of New Hampshire, in rejecting an attack on its statute relating to delinquent children, said:

"We think it sufficiently plain that the act in question. is designed to permit the exercise of the powers of the state as '*parens patriae*,' for the purpose of rehabilitating minor children, and not of punishing them for the commission of a crime. 'It is generally held that the purpose of such statutes is not penal, but protective. It is not that the child shall be punished for breach of a law or regulation, but that he shall have a better chance to become a worthy citizen.' *State v. Lefebvre*, 91 N. H. 382, 384, 20 A. 2d 185, 187. See also, *State v. Burt*, 75 N. H. 64, 66, 71 A. 30, *Ann. Cas.* 1912A, 232. Similar statutes have been universally upheld over objections based upon constitutional grounds. *Cinque v. Boyd*, 99 Conn. 70, 121 A. 678; *People v. Lewis*, 260 N. Y. 171, 183 N. E. 353, 86 A. L. R. 1001, *certiorari* denied 289 U. S. 709, 53 S. Ct. 786, 77 L. Ed. 1464; *Commonwealth v. Fisher*, 213 Pa. 48, 62 A. 198, 5 Ann. Cas. 92; *Ex parte Januszewski*, C. C., 196 F. 123; *Lindsay v. Lindsay*, 257 Ill. 328, 100 N. E. 892, 45 L. R. A., N. S. 908, *Ann. Cas.* 1914A, 1222; *Wissenburg v. Bradley*, 209 Iowa 813, 229 N. W. 205, 67 A. L. R. 1075; *In re Gomez*, 113 Vt. 224, 32 A. 2d 138. See also *Thomas v. United States*, 74 App. D. C. 167, 121 F. 2d 905, 907; annotations 60 A. L. R. 1342; 67 A. L. R. 1082."

See also the oft-quoted case of *Cinque v. Boyd*, 99 Conn. 70, 121 A. 678 (*Sup. Ct. Err.* 1923), where the court sustained the Connecticut act establishing juvenile courts and cited supporting decisions in Arkansas, California, Florida, Idaho, Illinois, Indiana, Kentucky, Louisiana, Maryland, Massachusetts, North Carolina, Ohio, Oregon, Pennsylvania, Tennessee, Utah and Wisconsin. *Cf. Ex parte Newkosky*, 94 N. J. L. 314, 315 (*Sup. Ct.* 1920); *In re Olcott*, 141 N. J. Eq. 8, 9 (*Ch.* 1947).

During colonial days and the early Nineteenth Century, our State dealt with child and adult offenders in identical fashion. See *Justice and the Child in New Jersey, Report of the New Jersey Juvenile Delinquency Commission*, 35

(1939). In 1850 legislative steps were first taken towards the separate confinement of children (*L.* 1850, *p.* 125; *L.* 1852, *p.* 476), although it was not until 1867 that the State Reform School for Juvenile Delinquents at Jamesburg was opened. Shortly thereafter the State Industrial School for Girls at Trenton was established. Finally there was legislative recognition that children do not have that degree of intellectual and emotional development which should subject them to adult responsibility and that child and adult offenders should therefore be differentiated before trial rather than after conviction. In 1903 county courts for juvenile offenders, consisting of the judges of the Courts of Common Pleas, were created. *L.* 1903, *c.* 219. In 1912 courts manned by special juvenile court judges were set up in first class counties. *L.* 1912, *c.* 353. In 1928 the Juvenile and Probation Study Commission, headed by Vice-Chancellor Bentley, recommended the adoption of new legislation based on the Standard Juvenile Court Act which had been prepared for the National Probation Association by a committee of judges from various states; pursuant thereto a comprehensive statutory revision was adopted in 1929 establishing juvenile and domestic relations courts and defining their jurisdiction over children under 16 years. *L.* 1929, *c.* 157; *R. S.* 9:18–1 *et seq.* Although the 1903 and 1912 acts had expressly excluded the crimes of murder and manslaughter from juvenile court jurisdiction, the 1929 revision contained no comparable exclusion.

In *In re Daniecki, by Ratner*, 117 *N. J. Eq.* 527 (*Ch.* 1935), affirmed 119 *N. J. Eq.* 359 (*E. & A.* 1936), Vice-Chancellor Backes had occasion to deal with the issue of whether a 15-year-old boy, charged with murder, was triable in the same manner as an adult in the Court of Oyer and Terminer. The vice-chancellor held that he was, expressing the sweeping view that the Legislature had no power "to vest jurisdiction in the juvenile court to try the crime of murder (or any other indictable offense) without a jury." He did not consider any of the many cases to the contrary throughout the states and if his view had ultimately prevailed it would have struck a mortal blow to the juvenile court

movement in our State. Fortunately, it was later rejected in *State v. Goldberg*, 124 *N. J. L.* 272 (*Sup. Ct.* 1940), affirmed 125 *N. J. L.* 501 (*E. & A.* 1940), where the court, while recognizing that assault with intent to kill was indictable at common law (*cf. State v. Maier*, 13 *N. J.* 235, 277 (1953)), held that, when committed by a 15-year-old, it was cognizable exclusively in the juvenile court. In the course of his opinion Justice Case noted that the goal of saving "erring children to their own better selves and to orderly, law-abiding society, is beyond criticism" and that juvenile court proceedings are not "by way of punishment but by way of reformation, education and parental care, intended to save children from the consequences of wrongful conduct which in an older person would merit indictment, conviction and punishment, and are in the nature of ascertaining what the conduct of a child under sixteen years has been and whether restraint and care from the public authorities should in larger degree be substituted for that which the child would ordinarily receive from its parents." In the recent case of *In re Lewis*, 11 *N. J.* 217, 224 (1953), Justice Brennan, in an opinion delivered for the entire court, similarly pointed out "that the statutory policy for the treatment of juvenile offenders is directed to their rehabilitation for useful citizenship through reformation and education and not to their punishment, even when the offense underlying the adjudication of juvenile delinquency is of a kind which when committed by an older person would merit indictment, conviction and punishment."

Immediately after Vice-Chancellor Backes had rendered his decision in the *Daniecki* case, holding that the 15-year-old boy before him was triable for murder in the same manner as an adult, the Legislature took affirmative steps to obviate its effects. It provided in *L.* 1935, *c.* 285, that a person under the age of 16 shall be deemed incapable of committing a crime under the common law or statute law of this State; and in *L.* 1935, *c.* 284, in defining delinquency cognizable exclusively in the juvenile court, it included conduct which, if committed by any one 16 or over, would constitute a

felony, high misdemeanor, misdemeanor or other offense. The statutory language was unmistakable in design; it appropriately embodied the clear legislative wishes as expressed in the following statements by Senator Wolber (later Judge), who was the introducer of *S*. 330 and *S*. 331 which later became *L*. 1935, *cc*. 284, 285 (*Board of National Missions by Presbyterian Church in the United States v. Neeld*, 9 *N. J.* 349, 358 (1953)):

"The purpose of the two bills is to vest exclusive jurisdiction in juvenile and domestic relations courts over all children who, while under the age of sixteen years, commit any offense which would constitute crime under the law as it now stands.

A recent decision of the New Jersey Court of Chancery declares the existing provisions having the same purpose, unconstitutional because they deprive the defendant of the right to indictment and jury trial. These bills eliminate the objection by providing that the juvenile delinquency does not constitute crime and the penalties for crime cannot be imposed.

The purpose is to effectuate the social policy already expressed in the juvenile and domestic relations court law of confining the handling of juvenile delinquents to specialists in the field. These bills merely correct a possible technical defect in the existing act, pointed to by the Chancery decision. This act was drawn by the New Jersey Crime Commission pursuant to a resolution adopted by the New Jersey State Conference on Crime."

In *In re Mei*, 122 *N. J. Eq*. 125 (*E. & A*. 1937), the question was again raised as to whether a 15-year-old was triable for murder in the same manner as an adult; the court held that he was notwithstanding the express terms of *L*. 1935, *cc*. 284, 285. It did not suggest that the Legislature intended to exclude murder from its comprehensive enactments; nor did it adopt the sweeping view of unconstitutionality expressed in the *Daniecki* case and later rejected in the *Goldberg* case. Instead, it rested on the unprecedented ground that since the charge of murder is "so horrible in fact and in the contemplation of society" it must remain "a crime within the purview of the Constitution, whatever name and whatever treatment may be appended to it by the Legislature." This ground would be equally applicable to cases involving children of very tender age, and the records at State Prison

disclose that as late as 1944 it was applied in Camden County to a youngster of 13 who was tried, convicted and sentenced to life imprisonment for a murder committed when he was 12. See also *State v. Smigelski*, 137 *N. J. L.* 149 (*Sup. Ct.* 1948), appeal dismissed, 1 *N. J.* 31 (1948). Viewed strictly as a legal ground it has no supporting basis whatever since the Constitution makes no pertinent mention of murder and the guarantees, when applicable, govern murder and other indictable common law offenses with like force. Viewed strictly as an emotional ground it concededly may not be given any controlling effect.

In approximately half the states the jurisdiction of the juvenile court over children under 16 is exclusive, even where the offense would constitute murder if committed by an adult. See *Juvenile Delinquency*, 261 *Annals* 129 (1949); *United Nations Comparative Survey on Juvenile Delinquency* 26 (1952). The Standard Juvenile Court Act as revised in 1949 likewise vests exclusive jurisdiction in the juvenile court over all children under 16. It also provides for jurisdiction over children from 16 to 18 but states that if the child is 16 or over and is charged "with an offense which would be a felony if committed by an adult" the juvenile court may, in its discretion, certify the child for criminal proceedings. To remove any doubts, it expressly directs that "no child under sixteen years of age shall be so certified." Judicial opinions sustaining such legislation are now legion and the *Mei* decision stands alone in its notion that a child of seven or over, charged with murder, must be tried in the same manner as an adult regardless of what the Legislature says on the subject. Although the decision is devoid of supporting reason and authority, the suggestion is advanced that since it was rendered many years ago it should be permitted to stand until altered by the Legislature. This approach might have some merit if the *Mei* decision turned on a matter of statutory construction, but the fact is that the court there asserted an absence of constitutional power which no amount of legislation could supply. See *Snyder v. State*, 189 *Md.* 167, 55 *A. 2d* 485, 487 (*Sup. Ct.* 1947). In any

event, the pertinent legislative enactments after the *Mei* case clearly reaffirm the plain statutory purpose to vest in the juvenile court, exclusive jurisdiction over children under 16 regardless of the severity of their offenses. See *L*. 1943, *c*. 97; *L*. 1946, *c*. 77; *L*. 1948, *c*. 284. In 1946 the Legislature, in dealing with juvenile court jurisdiction over persons between the ages of 16 and 18, expressly stated that the juvenile court may refer the matter to the prosecutor for criminal trial where the offense was of a "heinous nature." *L*. 1946, *c*. 77; *N. J. S*. 2*A*:4–15. See *State v. Vaszorich*, 13 *N. J*. 99, 110 (1953). No comparable provision was ever adopted with respect to children under 16, thus evidencing the legislative purpose of preserving the exclusive jurisdiction of the juvenile court in such instances. See *R. R*. 6:9–7. When our statutes relating to civil and criminal justice were recently revised, the Legislature re-enacted its comprehensive declarations that a person under the age of 16 shall be deemed incapable of committing a crime (*N. J. S*. 2*A*:85–4) and that juvenile delinquency shall include any act which, if committed by an adult, would constitute a felony, high misdemeanor, misdemeanor or other offense. *N. J. S*. 2*A*:4–14. And at the same time it reasserted the broad powers of the juvenile court, including authority for extended institutional commitment of offenders in appropriate instances. *N. J. S*. 2*A*:4–37. In *Re Lewis, supra*, this authority was invoked to sustain a reformatory commitment of a juvenile who had wantonly driven an automobile killing a pedestrian.

Until recently the legislative policy in our neighboring state of New York was to exclude designated crimes such as murder from the jurisdiction of the juvenile court. Thus its statute [*McK. Consol. Laws N. Y. c*. 40, *Penal Law*, § 2186], had provided that where a child under 16 committed an offense which would be "a crime not punishable by death or life imprisonment" if committed by an adult, he was not to be deemed guilty of any crime but was to be dealt with as a juvenile offender. Notwithstanding the express exclusionary language, the New York Court of Appeals held that a person under 16 who was charged, not with premeditated

murder, but with participating in a robbery which resulted in a killing, was to be treated as a juvenile offender. See *People v. Roper*, 259 *N. Y.* 170, 181 *N. E.* 88 (1932), reargument denied, 259 *N. Y.* 635, 182 *N. E.* 213 (1932); *People v. Porter*, 54 *N. Y. S. 2d* 3, 5 (*Cty. Ct.* 1945). As expressed in the *Porter* case, "although an adult may be convicted of first degree murder on proof that a killing occurs in the course of a felony upon which he is engaged, a 15-year-old youth may not be so adjudged, unless there is proof that he intended to kill." In the *Mei* case the child was accused of having committed a premeditated murder. In the case before us the 15-year-old Michael Monahan is not accused of having committed premeditated murder or any act with intent to kill; he is charged with having participated in a robbery with his father during which his father killed two persons. Under the statutory provisions and policy sustained by the Court of Errors and Appeals in the *Goldberg* case he is not triable as an adult for the robbery which he committed, yet the State contends that he is triable as an adult for the killing which he did not commit. If, as the statute directs, he is to be deemed legally incapable of robbery, it is difficult to see how he can be tried for murder during a robbery in the course of which another killed.

The problems presented by juvenile offenders are admittedly most serious in nature and are rightly receiving intensive study by legislative and administrative agencies at both federal and state levels. Our national hopes and destinies rest with our children and, fortunately, they are born both free and with promise for good. If along the way their freedom is lost and their goodness is not realized, society itself may be largely to blame. See *John Edgar Hoover, Juvenile Delinquency*, 4 *Syracuse L. Rev.* 179, 184 (1953):

"Criminal behavior is learned behavior. The child and the adolescent are impressionable, and their active minds develop codes of morality no higher than those to which they are exposed. The environment which the adult community provides its growing children is the most important factor underlying the behavior patterns cultivated by the normal child."

Centuries of history indicate that the pathway lies not in unrelenting and vengeful punishment, but in persistently seeking and uprooting the causes of juvenile delinquency and in widening and strengthening the reformative process through socially enlightened movements. *Cf. A. L. I. Draft, Youth Correction Authority Act*, § 16 (1940). Amongst the states, New Jersey has long been in the forefront in its recognition and development of this pathway; that it intends to retain its position is well evidenced by recent activities at the New Jersey State Diagnostic Center and the Highfields Experimental Treatment Project. See *Henry, The Right to be Good, The Welfare Reporter* (Dec. 1953), *p.* 1; *Life Magazine, Helping Bad Boys, A Plan Pays off for New Jersey* (March 15, 1954), *pp.* 24, 97.

There remain, nevertheless, strongly conflicting opinions as to how juveniles should be dealt with in cases involving homicide and other heinous misconduct. Some simply content themselves with expressions which couple their natural outrage and lack of sympathy for the juvenile court movement; they fail to suggest any alternative except, perhaps, the return to the barbarous days when eight- and ten-year-old boys and a 13-year-old girl were tried and executed for arson and murder. Others take the view that although the juvenile court movement is soundly based and should be strengthened, it should nevertheless be confined to non-heinous offenses, at least when older children are concerned; in other words, errant children should receive supervision and correction but only so long as they have not erred too greatly. Still others, however, urge both the strengthening and widening of the juvenile court movement, pointing out that the grossness of the child's misconduct intensifies rather than lessens the need for corrective supervision under the jurisdiction of a specialist judge, empowered to protect fully both the interests of the child and the public at large. In any event, the determination as to what is the wise and acceptable approach from society's viewpoint clearly rests with the other branches of government. Matters of statutory policy are

the exclusive concern of the legislative and executive branches which are fully accountable to the electorate acting at the polls; and statutory enactments may not properly be nullified in whole or in part simply because the judicial branch thinks them unwise. It is well that we ever remind ourselves that in our democracy the executive and legislative branches of government are the "ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts." Holmes, J., in *Missouri, Kansas, & Texas Ry. Co. of Texas v. May*, 194 *U. S.* 267, 270, 24 *S. Ct.* 638, 639, 48 *L. Ed.* 971, 973 (1904).

█ A majority of the court is satisfied that our present legislation lawfully vests exclusive jurisdiction in the juvenile court over misconduct by children under 16, including misconduct which would constitute murder or other heinous crime if committed by an adult. Accordingly, the order entered below is set aside and the matter is remanded to the Juvenile and Domestic Relations Court of Union County for further proceedings in accordance with the governing statutes and rules of court.

HEHER, J. (concurring). The Legislature in clear and indubitable terms admitting of no doubt of the purpose has decreed, as a prime and compelling measure of social policy, that a child under the age of 16 shall be deemed incapable of committing a crime, any and all offenses entailing criminal consequences under the common law or the statute law of this State when perpetrated by an adult, irrespective of the gravity of the misconduct, whether a capital or other heinous offense or any of the lesser evil deeds comprised within the category of crime, but rather that such misconduct shall be treated as "juvenile delinquency" when done by a child under 16 years subjecting the offender to protective custody, guidance and correctional treatment; and I, too, entertain the view that such an ordinance is within the legislative competency if it is in fact that and not in reality a punitive and criminal measure under a new and euphemistic label and a procedure that disregards the constitutional safe-

guards against arbitrary action in restraint of individual liberty, more especially the presentment process and the right of trial by jury.

The question is basically one of constitutional power and statutory construction, to be considered in the context of criminal responsibility and its essential nature.

A child is not criminally responsible at common law for his acts or omissions if he is of such tender years as to be incapable of distinguishing between right and wrong, and of understanding the nature of the particular act. At common law (1) under the age of seven years the presumption of incapacity is conclusive; (2) between the ages of seven and 14 years there is a rebuttable presumption of incapacity; and (3) above the age of 14 years there is a rebuttable presumption of capacity.

With some exceptions, a child is accountable for his torts in a civil action to the same degree as in an adult, for the object is to redress the personal injury by compensation, and not to punish the child, and so his mental capacity is generally immaterial. But when it is proposed to hold a child amenable to the criminal law, the *mens rea* is of the essence. At common law, a crime is a combination of a criminal act and a criminal intent. The maxim is *actus non facit reum, nisi mens sit rea.* A wrongful act and a wrongful intent must concur. *Reg. v. Tolson,* 23 *Q. D.* 168 (1889); *Levet's Case, Cro. Car.* 538 (1793); 1 *Hale P. C.* 474 (1778); *Commonwealth v. Mixer,* 207 *Mass.* 141, 93 *N. E.* 249, 31 *L. R. A., N. S.,* 467 (*Sup. Jud. Ct.* 1910); *State v. Labato,* 7 *N. J.* 137 (1951); *State v. Woodward,* 99 *N. J. L.* 49 (*Sup. Ct.* 1923). This was early deemed a principle of natural justice. *Fowler v. Padgett,* 7 *T. R.* 509, 514 (1798). It is a rule of justice discernible by right reason. Lord Abiger said, in *Rex v. Allday,* 8 *Car. and P.* 136 (1837), 173 *Eng. Rep.* 431: "It is a maxim older than the laws of England that no man is guilty unless his mind is guilty." And St. Augustine, speaking of perjury as a sin, said: "It is a sinful mind that makes a sinful tongue." This conception of divine law has influenced the common-law principle of

criminal responsibility. *Pollard and Maitland, History of English Law*, II, 476 (1895).

Under the common law, a child is not criminally responsible "unless he is old enough, and intelligent enough, to be capable of entertaining a criminal intent; and to be capable of entertaining a criminal intent he must be capable of distinguishing between right and wrong as to the particular act." *Clark and Marshall, Crimes (5th ed.* 1952), *sections* 38, 76; *Kean, The History of the Criminal Liability of Children*, 53 *Law Quar. Rev.* 364 (1937); *Woodbridge, Physical and Mental Infancy in the Criminal Law*, 87 *U. of Pa. Law Rev.* 426 (1939).

Children under the age of seven years are, by an arbitrary rule of the common law, conclusively presumed to be *doli incapax*, or incapable of entertaining a criminal intent, and no evidence at all can be received to show capacity in fact. This rule applies to both common-law and statutory offenses. *Reg. v. Smith*, 1 *Cox C. C.* 260 (1845); *Marsh v. Loader*, 14 *C. B. (n. s.)* 535 (1863); *People v. Townsend*, 3 *Hill (N. Y.)* 479 (*Sup. Ct.* 1842); *Commonwealth v. Mead*, 10 *Allen* 398, 92 *Mass.* 398 (*Sup. Jud. Ct.* 1865).

The presumption of such incapacity as to children between the ages of seven and 14 is not conclusive, as in cases of children under the age of seven, but rebuttable in the particular case by a showing of sufficient intelligence to distinguish between right and wrong, and to understand the nature and illegality of the particular act, or, as it is sometimes said, that he was possessed of "a mischievous discretion." 1 *Hale P. C.* 26, 27 (1778); 4 *Blackstone's Comm.* 23 (1800). The burden of proving capacity in this latter age group is upon the state; and capacity must be shown beyond any reasonable doubt. *Reg. v. Smith*, cited *supra; State v. Aaron*, 4 *N. J. L.* 231 (*Sup. Ct.* 1818); 4 *Blackstone's Comm.* 24 (1800).

Children over the age of 14 are presumed to be *doli capax*, and therefore responsible, but the presumption is rebuttable, with the burden on the accused to satisfy the jury that he did not have sufficient intelligence to understand the nature

and consequences of his act, and to know that he was doing wrong. *Clark and Marshall, Crimes* (*5th ed.* 1952), *sections 77, 78, 79.*

But in historical perspective we find, in the treatment of juvenile delinquents, evidences of unreasoning justice, expiative and retributive, a vengeful justice, in utter disregard of the physical fact of criminal capacity and the promptings of a humane and understanding psychology and sound sociology in the handling of behavior-problem children. In *York's Case, Fost. C. L.* 70 (1791), a boy of ten years, who, after killing a little playmate, concealed the body, was convicted of murder, and executed; it was considered that the circumstances showed a consciousness of guilt, and a knowledge of right and wrong. In another English case, a child of eight was convicted of arson. Emlyn on 1 *Hale P. C. 25, note.* In 1819 and 1821, these sentences were pronounced by English judges: on a 14-year-old boy who stole a cotton gown, value two shillings, "Seven years transportation;" on a 13-year-old girl for stealing a hat, "To be imprisoned six months"; on two boys, 11 and 13, accused of stealing about 17 shilling, "Guilty-Death." *Thurston's Concerning Juvenile Delinquency,* 3 (1942). And in our own State a boy of 13 was convicted and hanged for a killing when he was 12. *State v. Guild,* 10 *N. J. L.* 163 (*Sup. Ct.* 1828).

In criminal law, "intent" signifies a state of mind "which willingly consents to the act that is done, or free will, choice, or volition in the doing of an act"; it means that the act "is voluntary, that it proceeds from a mind free to act in distinction from an act done without mental capacity to understand its nature, or under circumstances which sufficiently show that it was the result of involuntary forces and against the will." Neither an act alone nor an intent alone can constitute a crime; therefore, an "actual intent to commit a crime may long precede its commission, but no predetermined intent is necessary for any length of time in connection with any crime, because if the will is simultaneous with the act it is sufficient." *Burdick, Law of Crimes, sections* 113, 115 (1946). Yet a criminal intent is not neces-

sarily an intent to do wrong; the voluntary doing of a forbidden act may be enough. At common law, the mental element required in every crime is the "voluntary exercise of the will, that faculty of the human mind which has the power of choice, and in the exercise of that power wishes, desires, determines or intends. The criminal law forbids and commands various things. If one chooses not to obey, and voluntarily carries that choice, or will, into effect by some act, the two necessary elements of crime are present, and the liability to punishment is incurred. This voluntary choice of doing what the law has declared to be crime constitutes what the law calls a bad or evil intent, otherwise called malice." *Ibid, sections* 112, 129, 129(a), 129(b) and 129 (c). The Legislature may make the doing of the prohibited act criminal or penal, regardless of a corrupt or criminal purpose or even knowledge of the illegal character of the act; and in such case only the doing of the proscribed act need be shown. *State v. Labato,* cited *supra.*

Blackstone, affirming the views of Coke and Hawkins, says: "Infancy is a defect of the understanding, and infants under the age of discretion, ought not to be punished by any criminal prosecution whatever." 4 *Blackstone's Comm.* 21 (1800); 1 *Coke's Inst.* 247(h) (1629); 1 *Hawk. P. C.* (*Curw. ed* 1787), 2.

We have here an enlightened concept of justice that equates intelligence and moral responsibility with criminal culpability, not always the rule in practice. But the age of discretion varies with the individual; and there is a twilight zone in which discretion and understanding vary in degree and render objective judgment difficult and uncertain. There is no absolute age at which it may be said, to use the words of Hawkins, that the individual is no longer "under a natural disability of distinguishing between good and evil." *Burdick, Law of Crimes, section* 154. But if incompetent minors are to be saved the penal·consequences of their irresponsible acts, an age of discretion and criminal accountability fairly grounded in the teachings and fruits of experience must needs be established by law, not alone to insure

the essence of justice to the individual child, but to effect the salvation of children of tender years and unripened understanding for the ultimate good of society itself. This in its very nature involves the exercise of a reasonable legislative discretion, directed by the common experiential knowledge of mankind. Considered in relation to the individual case, a rule establishing the age of discretion is perforce arbitrary; but it is sustainable as a measure of prime social import for the care and protection of irresponsible youth rather than punishment for a knowing and understanding criminal act.

Under the Roman law, the age of puberty was the age of discretion. The earlier jurists were not in agreement concerning the legal age of puberty, some insisting it should correspond in each case to the physical fact, others that it should be fixed uniformly by law. Justinian accepted the latter view and established the age of discretion at 14 in boys and 12 in girls. *Justinian's Inst.* 1, 22 *pr.* The common law followed the Roman law and set 14 years as the age of full criminal capacity. 1 *Coke's Inst.* 247(*b*) ; 1 *Hale P. C.* 28 ; 4 *Blackstone's Comm.* 23. See *Burdick, Law of Crime, sections* 155, 156.

But new concepts of the criminal capacity of youth have come from the crucible of human experience, in a complex society that has undergone great structural change; and New Jersey, in common with other states, has accepted the thesis that a person under the age of 16 is to be deemed incapable of committing a crime. *N. J. S.* 2A :85–4, whose genesis is *L.* 1935, *c.* 285.

There can be no doubt that this age limitation in relation to criminal capacity is within the legislative province. It is in accord with proved and generally accepted principles of sociology — — — a measure that bears a rational relation to the basic interests of society itself. History, as we have seen, is not without its instances of the criminal prosecution of children of tender years seemingly for wholly punitive purposes, irrespective of the existence of the mental qualities which are of the very essence of criminal responsibility. Under a system that made the physical fact the test of

criminal accountability in the particular case, miscarriages of justice were all too frequent, more especially in the complex of our present-day social organism. But above and beyond the danger of administrative mischance, failure and frustration, there is the undoubted fundamental consideration that children of such tender years, in the formative period of life, physically and psychologically are peculiarly susceptible to the sympathetic approach and the regenerative processes that make for individual uplift and social adjustment and integration. The humanitarian principle activates a modern socio-economic philosophy designed to serve the primary purpose of criminal justice as an instrument of society's protection against crime — — — not as a means of vengeance and retribution. but rather the furtherance of social justice and the general welfare. Erring youth offers a fertile field for remedial effort; and the obvious aim of this statutory policy is correction according to the science of human behavior, in the fulfillment of a primary social responsibility.

Child delinquency is largely due to broken homes and parental irresponsibility and default, and unfavorable environmental and associated factors, involving pressures that are ofttimes beyond the child's control; and the State, as *parens patriae*, undertakes by such means to provide for the wayward victims protective custody, care, discipline, and correctional treatment to fit them, psychologically and physically, for a useful social life. Once the status is established, the delinquent is treated much the same as the dependent or neglected child. Such concepts as "criminal responsibility," "guilt," "punishment," and the like, have no place here; custody and control are exercised for protective and correctional purposes — — — protection and treatment based on understanding rather than punishment based on a technical status of guilt. The policy is both preventive and reformative. The philosophy of the juvenile policy involved in statutes that render youths of tender years incapable of crime is child-protective and child-corrective. I would refer to Professor and Mrs. Glueck's *One Thousand Juvenile De-*

*linquents, pp.* 12, 13, 14, 16, 76, 241. The end in view is not criminal but social justice. Wayward children are a community problem; adult behavior ofttimes has its roots in childhood experiences. The redemptive process concerns diagnostic techniques and child therapy, by psychologic, psychiatric and other modes and methods which are not of immediate interest. There are those who would question the wisdom and efficacy of sociological techniques. But, once the legislative field of action is conceded, the legislative policy is not a justiciable issue.

Yet, in this, as in all other spheres of action, the Legislature is controlled by specific constitutional limitations.

In *State v. Goldberg,* 124 *N. J. L.* 272 (*Sup. Ct.* 1940), affirmed 125 *N. J. L.* 501 (*E. & A.* 1940), I had occasion to dissent from the holding that the then Juvenile Court Act, *R. S.* 1937, 9:18–1 *et seq.* constitutionally deprived the old Court of Oyer and Terminer of jurisdiction to try a 15-year-old boy on an indictment charging assault with intent to kill and the carrying of concealed weapons. The dissent was rested upon the thesis that it is beyond the power of the Legislature to term either murder or an assault with intent to kill "juvenile delinquency," and then proceed to an adjudication of guilt without regarding the constitutional safeguards applicable to criminal prosecutions, and impose upon such adjudication the penalty prescribed for the specific criminal offense thus branded juvenile delinquency. I read the then existing statute as purporting to do that very thing.

*R. S.* 1937, 9:18–30 authorized, upon such adjudication, the imposition of "the penalty provided by law" * * * one that was established as in consonance with the criminal concept of the particular transgression against society. For a specific offense, termed a crime when committed by a person of the age of 16 years or more, so it was provided, the court "may" impose the same penalty prescribed by the law in the case of an adult, although "on proper cause shown," it "may" direct that the child be placed on "probation" or committed (1) "to a public institution established for the care, custody, instruction and reform of juvenile offenders," or (2) "to any

other like institution commitment to which may be authorized by law," or (3) "to the care, custody and control of the state board of children's guardians as provided by law." This seemed to be the plain sense and significance of the legislative terms. The use of the permissive verb "may" in relation to these alternative courses of action could have no other meaning. The statute, *R. S.* 1937, 9:18–29, directed the Juvenile Court to "hear and determine all cases of children arising under" its provisions "without a jury," but secured a jury trial where an adult was charged with an offense triable by that mode, upon demand made. It is requisite that there be careful drafting of a statute of this class to distinguish between a delinquency and a criminal proceeding. both in procedure and treatment after the status is determined. *One Thousand Juvenile Delinquents*, cited *supra, pp.* 12, 17, where the Massachusetts and Illinois acts are analyzed. But it is not necessary to pursue the inquiry as to constitutional sufficiency. I would refer to the majority opinion in the *Goldberg* case and to *In re Mei*, 122 *N. J. Eq.* 125 (*E. & A.* 1937), and *In re Daniecki*, 117 *N. J. Eq.* 527 (*Ch.* 1935), affirmed 119 *N. J. Eq.* 359 (*E. & A.* 1935). It suffices to say that I held to the view that the difference in nomenclature did not alter the essential character of the act thus given judicial cognizance, and the infant could not be deprived of the constitutional procedures where conviction subjected him to the same penal consequences as the conviction of an adult.

But, beginning in 1943, there came a series of amendments of *R. S.* 1937, 9:18–12, eventuating in *N. J. S.* 2A:4–14 and 2A:4–15, which renders the validity of this hypothesis academic. By the amendment of 1943, the Juvenile Court was given exclusive jurisdiction over all cases of "juvenile delinquency," defined as the commission by a child under 16 years of age of any act which when committed by a person "of the age of sixteen years or over" would constitute "a felony, high misdemeanor, misdemeanor, or other offense," these among others. The court was given exclusive jurisdiction to

hear and determine "all cases of persons between the ages of sixteen and eighteen who shall commit any" of the enumerated offenses, "if the complaint in such cases shall be certified by the grand jury with the approval of the prosecutor of the pleas, or by the prosecutor of the pleas, or by a judge of the court of quarter sessions or special sessions," to the judge of the Juvenile Court, after investigation and report made by the chief probation officer of the county. It was directed that the Juvenile Court's hearings in such cases "shall be separate from those involving juveniles under the age of sixteen years"; and the court was empowered, "at any time before final adjudication," to "return" the complaint whence it came "if, in its judgment upon the facts disclosed at the hearings, the complaint should not be adjudicated" in the Juvenile Court, or thereafter for a violation of the conditions of probation, and thereupon "jurisdiction shall be resumed by the grand jury, prosecutor of the pleas, the court of quarter sessions or special sessions, as the case may be, as if said complaint had not in the first instance been certified" to the Juvenile Court. *L*. 1943, *c*. 97.

There were amendments in 1946, *c*. 77, and in 1948, *c*. 284, and then came *N. J. S.* 2*A* :4–15, in 1953, defining "juvenile delinquency" as the commission by a child under 18 years of age of any act which when committed by a person of the age of 18 years or over would constitute a felony, high misdemeanor, misdemeanor, or other offense, and providing that if it shall appear to the satisfaction of the Juvenile Court that "a case of juvenile delinquency," as thus defined, committed by any juvenile of the age of 16 or 17 years "should not be dealt with by the court, either because of the fact that the person is an habitual offender, or has been charged with an offense of a heinous nature, under circumstances which may require the imposition of a sentence rather than the disposition permitted by this chapter for the welfare of society, then the court may refer such case to the county prosecutor," and a juvenile of the age of 16 or 17 years "may demand a presentment and trial by jury and, in such case, when this act is made known to the court, such case" shall be

"referred to the county prosecutor," and thereafter "be dealt with in exactly the same manner as a criminal case."

There is determining significance in this classification that resolves the constitutional problem I found in the earlier statute considered in *State v. Goldberg*, cited *supra*. The subjection of youthful delinquents of 16 or 17 years to a "sentence" rather than the "disposition" permissible under the act "for the welfare of society," where the delinquent is "an habitual offender" or the offense charged is of a "heinous nature, under circumstances" requiring the "imposition of a sentence," and the recognition of the constitutional rights of presentment and trial by jury in such cases, make manifest a legislative purpose to exonerate delinquents under 16 years of age from the essentially penal consequences of acts that would be criminal if perpetrated by persons above that age, and to subject them to society's care, protection, and corrective custody for the individual's social uplift and the common good.

Intent would seem to be an ingredient of juvenile delinquency also; but it is not criminal intent, penal rather than correctional in its consequences when the wrongful act occurs.

But, by the same token, there is no statutory distinction in this regard between "capital" and "noncapital" acts or offenses. A delinquent of 16 or 17 years is made criminally responsible in the given circumstances, but under the safeguard of all constitutional guaranties, rather than the object of reformative measures merely under the Juvenile Act. Delinquents under the age of 16 years are wholly incapable of crime, no matter what the nature or gravity of the act when done by one of criminal capacity, and are amenable only to protective care and custody and the rehabilitative process for the social good as well as their own interest. This by certain and unequivocal terms. There being in the contemplation of the law the absence of punitive fault, the delinquent behavior and waywardness cannot entail punitive consequences. Delinquency in its statutory connotation suggests the psychological rather than the judicial attitude

toward the offender. Such is plainly within the competency of the State, as *parens patriae.*

The Legislature is the forum for those who would quarrel with the wisdom of this concept of moral and social responsibility. The constitutional doctrine of separation of powers forbids judicial superintendence of legislative policy. One of the primary functions of the judiciary is to confine the coordinate legislative and executive departments of government within their respective spheres of action, but it must be certain that in this process of containment it maintains the balance against excesses and intrusions of its own.

Thus it is that I cannot subscribe to the view that murder is a crime *sui generis* that remains a crime within the purview of the Constitution, and as such is not subject to different legislative classification such as we have here, following *In re Mei* and *State v. Goldberg,* cited *supra.*

Even on that hypothesis, the indictment for murder is not sustainable against this 15-year-old boy unless it be shown that he entertained a criminal intent to commit robbery; and under the holding in the *Goldberg* case he is by the statute incapable of robbery. The criminal offense laid against him is murder in the perpetration of a robbery; and where there is criminal capacity, the homicide in such circumstances is murder in the first degree, even though not a willful, deliberate and premeditated killing. *R. S.* 1937, 2:138–1, 2, *N. J. S.* 2*A*:113–1, 2. The intent to commit the crime of robbery is an essential element of the statutory offense of murder in the first degree; and of this the infant defendant was incapable as a matter of law. I would refer in this regard to the dissent in *State v. Grillo,* 11 *N. J.* 173 (1952).

In *People v. Roper,* 259 *N. Y.* 170, 181 *N. E.* 88 (*Ct. App.* 1932), the New York Court of Appeals considered a felony murder in relation to a statute providing that only a child under seven years is incapable as matter of law of committing a crime, though a child "of the age of seven years, and under the age of twelve years, is presumed to be incapable of crime, but the presumption may be removed by

proof that he had sufficient capacity to understand," and "a child of more than seven and less than sixteen years of age, who shall commit any act or omission which, if committed by an adult, would be a crime not punishable by death or life imprisonment, shall not be deemed guilty of any crime, but of juvenile delinquency."

Pointing out that under the statute, a child of 15 years may be guilty of murder in the first degree, Lehman, J., said:

"When guilt of a crime has been established, its penal consequences are the same for child and adult criminal. But guilt cannot be established without proof of every essential element of the crime, and, since a felonious intent is an essential element of the crime of murder, guilt of a defendant can never be established without proof of such intent. Thus, the guilt of a defendant charged with murder in the first degree may depend upon his capacity to form the felonious intent. Then the fact that a defendant is under the age of sixteen may carry legal consequences. There can be no murder without evidence of malice and felonious intent and a depraved mind. The indictment was sufficient in form when it simply accused defendant of having killed the deceased 'wilfully, feloniously, and with malice aforethought.' On the trial it was necessary to prove such malice and willful and felonious conduct, and this necessity was satisfied in accordance with the provision of the statute by showing that the homicide occurred while the defendant was engaged in the commission of another felony. * * * The crime of murder charged in the indictment is a single crime, whether committed by design or during the commission of an independent felony; 'the independent felony like the deliberate and premeditated intent being established solely for the purpose of characterizing the degree of the crime so charged, the evil mind or purpose inherent in the killing.' *People v. Lytton*, 257 *N. Y.* 310, 315, 178 *N. E.* 290, 292 [79 *A. L. R.* 503]. The defendant may have participated in the robbery; but, unless that participation was with felonious intent, he was not guilty of the felony, and, if he was not guilty of the independent felony, participation does not evince 'the evil mind or purpose inherent in the killing.' * * * The defendant can be convicted of murder in the first degree only upon a finding of 'felonious intent.' The verdict of the jury imports a finding that the defendant participated in the commission of a robbery, as defined by the statute, for the trial judge charged that without such finding the verdict must be not guilty. Upon the trial of a defendant over the age of sixteen years, a finding of participation in a robbery, as defined by the statute, would import a finding of 'felonious intent,' for robbery, in every degree, is a felony. Upon the trial of a child under the age of sixteen, the participation of a child in a robbery, or at least in a robbery in the second or third degrees, would not establish the guilt of a felony,

but only of a minor offense characterized as juvenile delinquency. Hence, it is plain that the defendant's conviction rests upon no finding of guilt of a felony, and thus no finding of felonious intent, and the judgment must be reversed. * * * Upon the new trial this defendant may be tried for murder in the first or second degrees committed through the killing of a human being with intent to effect his death. Such an action may be impelled by 'evil mind' and felonious intent as evidenced by the criminal acts of the child, but not by acts which the Legislature has declared are not criminal when committed by a child. A person who with evil mind commits a crime may, in the interests of society, be punished, even by death for the undesigned and unforeseen result of the crime. No person, certainly no child under the age of sixteen, is subject to death or life imprisonment because of the calamitous though undesigned result of acts which are not criminal in their inception."

Here, guilt of the murder laid to the accused child by the indictment can be predicated only of the commission of a crime of which by the statute he is incapable, and so the requisite felonious intent would be wanting. The illogic of the converse of this hypothesis would seem to be incontestable; and if it is not good logic, it is not good law, for it is to be presumed that the Legislature intended the logical consequence of the declared policy.

I concur in the reversal of the order and the remand of the cause to the Juvenile and Domestic Relations Court.

OLIPHANT, J. (dissenting). I find myself compelled to dissent in this case because I differ basically with the approach and reasoning of the majority opinion.

In *In re Mei*, 122 *N. J. Eq.* 125 (*E. & A.* 1937), it was held that the provisions of *N. J. S.* 2A:85-4 and *R. S.* 9:18-12 did not deprive the grand jury or the courts in finding a murder indictment against the defendant under the age of 16 years and trying it. In that case it was held that the accused, who was 15 years and 4 months of age when the crime was committed, could not be held under a charge of murder by the Juvenile and Domestic Relations Court because "a charge * * * of murder cut so deeply into human emotions, collides so violently with life's experiences and fair expectations, and is so horrible in fact and in the contemplation of society, that it remains a crime within the

purview of the Constitution, whatever name and whatever treatment may be appended to it by the legislature."

This observation goes to the very heart of the problem in attempting to bring the crime of murder within the statutory definition of "juvenile delinquency" over which subject the Juvenile and Domestic Relations Court is vested with jurisdiction by the statute. *N. J. S.* 2A:85-4 merely re-enacted the provisions of *L.* 1935, *c.* 285, which was passed in conjunction with *L.* 1935, *c.* 284, defining juvenile delinquency. Both statutes became effective June 27, 1935, two years prior to the decision in the *Mei* case. The *Mei* case turned on the question of constitutional power and not of policy.

The legislative enactments subsequent to the *Mei* case, *L.* 1943, *c.* 97; *L.* 1946, *c.* 77 and *L.* 1948, *c.* 284, were likewise prior to the decision in *State v. Smigelski,* 137 *N. J. L.* 149 (*Sup. Ct.* 1948), appeal dismissed 1 *N. J.* 31 (1948). I discern no clear-cut legislative intention in these statutes to ignore the flat holding in the *Mei* case that murder was beyond the purview of the jurisdiction of the Juvenile and Domestic Relations Court. I am compelled to follow the established rule that where a statute has been construed by the courts and this construction has been supported by long acquiescence on the part of the Legislature or by continued use of the same language, or by failure to amend the statute with respect to the particular question, that this is evidence that such construction is in accordance with the legislative intent. *Commissioner of Banking & Insurance v. Moresh,* 122 *N. J. L.* 77 (*E. & A.* 1939); *Barringer v. Miele,* 6 *N. J.* 139 (1951); *Miller v. Board of Chosen Freeholders,* 10 *N. J.* 398 (1952). Therefore, I conclude that the holding in the *Mei* case is still controlling and that the Juvenile and Domestic Relations Court is without jurisdiction to try a charge of murder as defined by *N. J. S.* 2A:113-1, 2.

The majority, however, have in effect overruled the holding in the *Mei* case and assert that under the *parens patriae* doctrine, both on psychological and sociological grounds, the State and the Legislature have the power to treat such a crime when committed by an infant on a psychological or

sociological basis and bring it within the definition of juvenile delinquency as set forth in the statute.

The right of punishing malefactors derives its origin from that which every individual originally had in the society of nature to repel the injuries committed against himself, or against members of the society; a right that has been yielded and transferred to the State. The principal end of punishment is the welfare of society, but there are many various means of arriving at this end according to varying circumstances, and the State in inflicting punishment may propose different and particular views consistent with the welfare of society. In the words of Grotius, "In punishments we must either have the good of the criminal in view, or the advantage of him whose interest it was that the crime should not have been committed, or the good of all indifferently." So it is universally acknowledged that if the State proposes to correct the criminal and impose a punishment, the punishment, if the criminal is reformed by it, tends to the public good. But punishment ought to be strictly subordinate to the principal end of criminal processes; namely, the safety of the public. Prudence dictates that the justice established for the preservation of society should not be exercised in such a manner as to subvert the State. Within this general ambit the action of the Legislature is free from judicial restraint under our doctrine of the separation of the powers, and whether punishment for a crime should be solely punitive or correctional or a combination of both is strictly within the Legislative province.

But the nub of the problem here presented revolves around the statutory provision, N. J. S. 2A:85-4, which provides:

"A person under the age of 16 years is deemed incapable of committing a crime."

This provision seemingly ignores the fundamental fact of the law of nature as applied to man and facts of everyday existence which are of common knowledge and public notice.

I cannot comprehend the reasoning that suggests that marauding gangs of little hoodlums armed with guns, knives,

switch knives or other lethal weapons are to be considered as a matter of law incapable of committing the crime of murder. Infants under the age of 21 years, according to statistics, perpetrate a high percentage of the heinous crimes committed throughout the country, and the situation has reached such serious proportions that it is a threat to the public welfare and safety of the law-abiding citizen. In one instance it reached the alarming situation where a confirmed criminal had organized a gang of teenagers "to murder and rob" while he himself never took physical part in the crimes. This gang of little hoodlums committed 50 holdups and burglaries in a period of eight months with weapons supplied by the confirmed criminal. Murder by an individual criminal is bad enough, but when it appears that a confirmed criminal has organized a group of teenagers for the sole purpose to murder and rob, then the time has come to examine the underlying philosophy of the treatment of juvenile offenders particularly where the crime of murder is involved.

Homicide or the killing of any human creature is of three kinds: justifiable, excusable and felonious. The first has no share of guilt at all, the second very little, but the third is the highest crime against the law of nature that man is capable of committing. 2 *Chitty's Blackstone* *178.

The constituents of a criminal offense are an evil intention and an unlawful act, *State v. Labato, 7 N. J.* 137 (1951), so that the effect of the legislative declaration above quoted is that any infant who is mentally capable of forming an evil intent and commits the overt act of homicide is not guilty or cannot be found guilty of the highest crime against nature, because he is incapable of a criminal intent merely because of his age.

The principal end of civil government on society is to secure to mankind all their natural advantages, and especially their lives. Of all the natural rights the preeminent one is the right to life. Man is not a master of his own life nor can he voluntarily accede to the proposition that the State is master of his life except in two situations: (1) in the indirect manner for the defense of the State, and (2) in the

direct manner for the punishment of crimes. His right to life is based upon a natural law; otherwise he would be the creature of the State, he would have no rights based upon his own nature as a rational being except the rights given to him by the State. What rights the State might give to him it could take away from him, and if this were so the word "unalienable" as used in Article I of the Constitution of 1947 would become another synonym for "expendable."

Article I of our Constitution provides:

"All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness."

Thus there is reserved to the individual citizen his unalienable rights, including that of life and liberty.

Natural liberty is the right, which nature gives to all mankind, of disposing of their persons and property after the manner they judge most convenient to their happiness, on condition of their acting within the limitation of the law of nature and of their not abusing it to the prejudice of their fellowman. To this reciprocal right of liberty there is a reciprocal corresponding obligation, by which the law of nature binds all mankind to respect the liberty of other men and not to disturb them in the use they make of it so long as they do not abuse it.

Civil liberty, on the other hand therefore, is nothing more than natural liberty so far restrained by positive law as is necessary for the preservation of human rights and the maintenance of peace and order in society. Civil liberty is natural liberty, regulated by such laws as are necessary for the maintenance of justice and attended with the right of every citizen and person of insisting that the government shall make the proper use of its authority, and the security that this unalienable right of natural and civil liberty shall be respected and protected. Thus it is that the highest duty of the State is to protect the life of man. Man as a citizen of the State has a right to insist that the positive law of the State discharge this duty. He and his children have rights

in this respect that are superior to those of the child malefactor.

In every civilized society in history murder has been considered to be naturally and inherently wrong. It is *malum per se* because from the very nature of the transaction it violates the highest natural right of man. Every civilization or society has considered murder the highest offense against the law when committed by a rational human being, and it has never been questioned that murder is wrong and *malum per se*. This principle of the natural law is immutable and indisputable and was well understood by the founding fathers, and the mere fact it is not specifically mentioned in the Constitution is of no moment in view of the general guarantees of unalienable rights of man found in Article I.

As is stated in the *Mei* case, the mere restatement of this proposition as part of the positive law adds nothing to the turpitude of the crime of murder. In murder by a felonious act the right of life is wiped out, and if this can be done with impunity or lack of guilt on a psychological or sociological basis, then the other unalienable rights, among which are the right to personal liberty, to freedom of speech, to liberty of conscience and to private property, would be utterly futile and sterile. All attempts to protect and defend them in the judicial forum would be without meaning or purpose if the right to life is not inviolable and by legislative fiat the positive law can say that an infant mentally capable of criminal intent is incapable of committing the crime of murder. Man, including children, is a rational animal, a psycho-physical being capable of rational thought and free will. Unless he is mentally incompetent and thus irrational, there comes a point in the life of each when he becomes capable of distinguishing between right and wrong. This is in the nature of man himself, although the point at which it is reached depends upon the type of society or civilization in which he lives and will also vary somewhat with each individual.

At the common law and in this State, insofar as a crime is concerned, the inability to form a criminal intent is a matter of defense. As to children under the age of seven

years there is a conclusive presumption that the child was *doli incapax,* or incapable of entertaining a criminal intent, and no evidence can or should be received to show capacity in fact. Between the ages of seven and 14 the presumption is rebuttable, but the State or prosecution has the burden of showing that the infant has sufficient intelligence to distinguish between right and wrong and to understand the nature and illegality of the particular act. Over the age of 14 children were and are presumed to be *doli capax* and therefore responsible. The presumption is rebuttable but the burden of proof is upon the defendant to establish that he did not have sufficient intelligence to understand the nature and consequences of his act. These rules are consistent with the nature of man and the natural use of his faculties of intellect and will, and his freedom to acquire the necessary knowledge to make the distinction between right and wrong. They are rules to determine the ultimate fact of the ability of an individual to distinguish between right and wrong. The point in life when a person is capable of making this distinction may vary, but once it is reached that person, whether it be an adult or a child, is capable of criminal intent.

The trial and conviction for a crime is strictly within the judicial province and the determination of the ultimate fact of criminal intent is likewise within the judicial province. And this being so, as I see it, the constitutional guarantees with respect to indictment and trial are applicable. Once an indictment is found, the trial of the ultimate fact of criminal intent, which is the most important element in a charge of murder, must be tried by a jury.

The views expressed here were of sufficient moment to induce the Legislatures in many states to remove the charge of murder from the field of juvenile delinquency. It is indeed a curious anomaly that in this country, where civilization in some respects has reached its highest peak insofar as the welfare and comfort of an individual is concerned and where the educational opportunities are practically unlimited for a child, we are brought face to face with a statute that in effect denies that the normal child is a rational human

being insofar as the highest crime against nature is concerned. I doubt that even in the primitive state of civilization there is any society that subscribes to such a proposition. Bluntly, the statute practically says that a child, within defined age limits, is not a rational being but merely an animal without the will or mind to control its baser animal instincts.

The appellant makes the argument that all previous pertinent decisions of the court of last resort in this State, *In re Daniecki, by Ratner*, 117 *N. J. Eq.* 527 (*Ch.* 1935), affirmed 119 *N. J. Eq.* 359 (*E. & A.* 1936); *In re Mei, supra; State v. Smigelski, supra*, are cases in which the infant defendant was a willful, deliberate, premeditated killer or was the actual killer in the perpetration of a robbery or other felony. He refers to such murders as "designed murders." He contends that these cases are not in point here where the infant defendant was not the actual killer and that there is no case in this State involving "a felony murder" by an infant where the criminal intent or scienter is predicated upon the commission of crimes listed in *N. J. S. 2A*:113–1, 2.

Murder, by statute, is defined as follows, *N. J. S. 2A*:113–1:

"If any person, in committing or attempting to commit arson, burglary, kidnapping, rape, robbery, sodomy or any unlawful act against the peace of this state, of which the probable consequences may be bloodshed, kills another, or if the death of anyone ensues from the committing or attempting to commit any such crime or act; or if any person kills a judge, magistrate, sheriff, coroner, constable or other officer of justice, either civil or criminal, of this state, or a marshal or other officer of justice, either civil or criminal, of the United States, in the execution of his office or duty, or kills any of his assistants, whether specially called to his aid or not, endeavoring to preserve the peace or apprehend a criminal, knowing the authority of such assistant, or kills a private person endeavoring to suppress an affray, or to apprehend a criminal, knowing the intention with which such private person interposes, then such person so killing is guilty of murder."

The degrees of murder and the punishments are fixed by *N. J. S. 2A*:113–2, which reads:

"Murder which is perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, or which is committed in perpetrating or attempting to perpetrate arson, burglary, kidnapping, rape, robbery or sodomy, is

murder in the first degree. Any other kind of murder is murder in the second degree. A jury finding a person guilty of murder shall designate by their verdict whether it be murder in the first degree or in the second degree."

The statutes make no distinction between those who do the actual killing and those who do not where the killing occurs in the commission or attempt to perpetrate any of the crimes enumerated therein. Under these sections one who aids, abets, counsels or procures another to commit murder provided he is near enough to render assistance, is a principal and not an accessory. *State v. Giberson,* 99 *N. J. L.* 85 (*E. & A.* 1924); *State v. Mule,* 114 *N. J. L.* 384 (*E. & A.* 1935).

The appellant further argues that the commission of the crime, in this instance robbery, provided the criminal or felonious intent for the crime of murder and that under the provisions of *N. J. S.* 2A:85–4 the defendant is deemed incapable of committing the crime of robbery. He relies principally upon the case of *People v. Roper,* 259 *N. Y.* 170; 181 *N. E.* 88 (*Ct. App.* 1932), and many other cases in other jurisdictions not dealing with the crime of murder.

But our law is to the contrary. In *State v. Mowser,* 92 *N. J. L.* 474, 479, 483 (*E. & A.* 1919), it is held that the heinous offense is the killing and the crime of robbery, while it is an essential and integral part of the principal offense, is not a distinct affair but grows out of the same transaction. All murder at the common law was a capital offense and there was no grading of murder or definition of degrees of the crime, and such is the situation in England today. The reason for grading or fixing degrees of murder is to provide different punishments in different situations, and I do not challenge the legislative competency in this respect. The history of legislation of this type is discussed at some length in 22 *Fordham L. Rev.* 274.

Our Legislature, following this theory, set up two classifications of murder, murder of the first degree and murder of the second degree, and it made the crime of robbery a constituent element of murder in the first degree where death

results from the perpetration or the attempt to perpetrate a robbery. In so doing it reiterated the doctrine of the common law that if death results in the prosecution of a felonious intent or in its consequences naturally tended to bloodshed, it will be murder. 4 *Chitty's Blackstone* *193. It made murder in the first degree a capital offense punishable by death unless the jury recommends life imprisonment. *N. J. S.* 2*A*:113–4. We have but two capital offenses in this State; they are murder in the first degree, *N. J. S.* 2*A*:113–1, 2, 4, and treason, *N. J. S.* 2*A*:148–1.

Whether in the matter of punishment of murder the Legislature feels it desirable to place children in a different classification is purely a matter of public policy and within the legislative power. But insofar as guilt for the commission of the crime of murder is concerned I cannot disregard the enormity of the offense by fine spun legal reasoning and agree that it can be treated as mere juvenile delinquency.

I am unable to subscribe to nor can I find support for the legal theory by which the Legislature can declare that those young in years but old in crime and depravity are incapable of committing the crime of murder. Many such are experienced criminals. A prominent jurist recently said: "The whole problem of juvenile and adolescent delinquency has become worse and is now a scandal."

A peaceful citizen has the right to be protected by his government and to have a spade called a spade, and if young hoodlums are mentally incapable of a criminal intent they should be put to the burden of establishing that proposition in a court of law under established rules and are only entitled as a matter of right to the constitutional guarantees afforded to other citizens.

I would affirm the order of the court below in denying the motion for the transfer of the indictments to the Juvenile and Domestic Relations Court.

WACHENFELD, J. (dissenting). Over the many years our present procedure in reference to these matters has worked out quite satisfactorily. No hue or cry of great injustice has

been heard, nor is there a single case the disposition of which has offended the public's sense of essential fairness.

The method of disposing of these cases has now been changed, not by legislative enactment, where the power admittedly resides, but by a new judicial interpretation. *In re Mei*, 122 *N. J. Eq.* 125 (*E. & A.* 1937), which has stood for 17 years, is overruled and is no longer the law.

Up until now, all who committed murder, whether old or young, were held strictly accountable to the law. If the offender appreciated the difference between right and wrong, he was answerable in a court of law for the highest crime known, the taking of another's life.

Today's youth is more precocious than yesterday's. His aggressiveness has not been diminished, and the record unfortunately shows his propensity for going out of bounds has not decreased. The child who flouts authority is becoming too prevalent, and the seriousness of these infractions is becoming increasingly grim. Juvenile delinquency is still one of our foremost problems, and its solution is being vainly sought by educator, legislator and many public agencies.

How, then, will this change in the law affect the dilemma confronting us? Will it help or hinder? Those of tender age who are likely to commit the crime involved will certainly not be additionally deterred by the knowledge that the punishment for it has practically been abolished and the worst that can befall them for committing a felony murder under the new rule is confinement in a reformatory or correctional institution for the term fixed by the trustees, not to exceed in any case a few years.

Erring youth indeed offers a fertile field for remedial effort, but I doubt if in this instance we are making much of a contribution.

The police now cannot keep track of those they have apprehended and referred to the Juvenile Court. The disposition there is confidential and secret and makes better law enforcement by those responsible for it more difficult. To the classification of the offenses so processed we now add the crime of murder. I have grave fears of its consequences.

I cannot embrace many of the expressions in Justice Oliphant's dissent, but I feel obligated to state briefly the reasons why I would adhere to the decision in *In re Mei, supra,* and therefore affirm the judgment below.

HEHER, J., concurring in result.

*For affirmance*—Chief Justice VANDERBILT, and Justices OLIPHANT and WACHENFELD—3.

*For reversal*—Justices HEHER, BURLING, JACOBS and BRENNAN—4.